Good morning, may it please the Court. I'm Jessica Smith-Bobadilla for Petitioner Raul Alejo Valdivias. I would like to reserve two minutes of my time for rebuttal. Petitioner Raul Alejo Valdivias is a 42-year-old native and citizen of Mexico. His wife, who is also undocumented, suffers from a variety of serious health ailments, ranging from Graves' disease to serious heart problems, hyperthyroidism, as well as a large goiter. These conditions are severe, as evidenced by medical documentation and the record, so severe that the couple has to travel to San Francisco to UCSF for treatment because the doctors near their home in Merced, California, are not sufficiently specialized to treat Petitioner's wife. Do you have any evidence, Ms. Bobadilla, of whether or not your client received or was informed by Mr. Pineda of the immigration judge's decision granting a 60-day voluntary departure from December 22, 2005? I don't have any evidence of that, Your Honor. I am not, I don't have any evidence in the record to indicate that. I know that the Petitioner has stated in his declarations and in the record in numerous places that he was not advised of critical decisions in his case. It is noteworthy as well that in this case we submitted a claim to the California State Bar Client Security Fund. We realize that that decision is in no way binding on this court, but they did, given the evidence that we presented, elect to return $8,000 of $8,075 as compensation for the legal fees Petitioner had paid to Mr. Pineda. Counsel, but even assuming that the attorney didn't properly advise her, she was told by both the immigration judge and the Board of the importance of doing it within the voluntary departure time. Well. She didn't do it. That is correct, Your Honor. However, we'd also have to note that the law has changed since this case was submitted. The Supreme Court has decided Dada v. McKayse, which had Petitioner had the benefit of that case, would have been able to elect to withdraw his voluntary departure and proceed with the motion to reopen, not facing the stiff penalty of the bars. I believe it's still an open question whether Dada v. McKayse applies retroactively to people in Petitioner's position, and my understanding is that this Court in Navarrez-Navarrez v. Holder decided that it was upon the Board to decide that in that case, as it would arguably be in this case. So what was the status of the – there was a lot of – there were several proceedings here on the motions to reopen and the appeal and – Well, there was a direct appeal. What's your understanding of what she knew sort of at the end, when the time was really running? My understanding of when Petitioner realized that something was really wrong was he did receive a letter from the Board in November of 2006 saying that Mr. Pineda was no longer practicing. There were some critical events around that time. This Honorable Court dismissed a petition for review that Mr. Pineda had filed challenging the denial of a motion to reopen. This Court denied it for lack of jurisdiction, and that decision was issued October 17, 2006. Mr. Pineda was temporarily suspended, I believe five days after that, on October 23, 2006, and Petitioner did not receive communication from him around that time until he got the letter stating that in November that Mr. Pineda was no longer practicing. He placed multiple calls and eventually was able to set up a meeting with Mr. Nathan Zaslow in San Francisco in December. Promptly after that, he started to call other attorneys and retained my services by January. Now, my question was more related to what Judge Hug, the concern that Judge Hug raised. So what did he know about his obligation, apart from what Judge Hug pointed to? Petitioner was. What does the record show regarding his knowledge of his obligation to voluntarily depart the country before the expiration? He had been advised on the record in August 2004 that he had 60 days. However, he was told by the various associates as they were filing things that he did not need to because different filings were made. Really, in fact, because the December 2005 decision of the court was not appealed to this Court, he had 60 days from that date in reality, although he was not advised of that fact. What was that date? December 22, 2005. My understanding is he would have had 60 days from that date to voluntarily depart timely. And there's nothing in the record that shows that he knew at that time that he had to depart the country? There's nothing in the record, Your Honor. And at that time, who was representing him? In at that time, Mr. Pineda's office was still representing him up until the end of 2006. So it's my understanding under the Board's case law that the voluntary departure sort of embedded within that is the notion of knowing. Yes. You have to know that you're. That is correct. And there have been, this is not mentioned in my brief, but post, I mean, since the briefs have been submitted, I've discovered some new information. In January 2006, Congress actually amended INA Section 240BD, and then there was a subsequent Board decision, INRI Bozena Majuska, 24 INN Decision 87. That's a 2007 decision of the BIA. And Congress actually amended the language and changed the language of that section to change that failed to voluntarily depart, and they switched it to voluntarily fails to depart. And that Board precedent that I just mentioned actually considered a woman's case who received ineffective assistance and did not depart on time, and the Board found an exception in that case. It's more narrow than the pre-IRA-IRA exceptional circumstances exception, but it doesn't allow an exception in cases such as this case. Where they don't. Impose the. Voluntary incorporates that they know that they've got to leave the country. Correct. That voluntarily would require you to have the information to take those steps to do it willfully. You're not saying, then, that he was unaware that at the expiration of the voluntary departure date, if he knew about it, that he knew that he had to leave, correct? Correct. All right. What you're saying is that the running of the time, he may not have been notified when it began and when it ended. Correct. And, in fact, what he was told was that we're filing new things, you know, you don't have to leave. And so each time something new was filed, it told the time further. That was his understanding, although that is not what the law would support. All right. And so the end of December, right before Christmas in 2005, and then the 60 days would have run sometime in February, and that's when you file your first filing, correct? Well, actually, Mr. Pineda was still his attorney at that time and didn't file anything until March of 2006 when he then presented a motion to reopen with evidence that the immigration judge noted she would have liked to have to decide the case back in 2004. All right. And you're in the case then the following year? Yeah, I was retained in January of 2007, and we filed the motion to reopen in February of 2007. Thank you. Thank you. Would you like to save the rest of your time? Yes, I would, Your Honor. Thank you. May it please the Court. Stuart Nick, I'm on behalf of the Attorney General. The petition for review in this case should be denied, as the Board did not abuse its discretion in concluding that the Petitioner failed to establish prejudice arising from the denial, cancellation of removal, or to exercise due diligence in pursuing the ineffectiveness of the counsel claim. I think the Court is kind of focusing on the prejudice issue. I think it's relevant to look at the timeline as to the exactly when he was supposed to voluntarily depart. Under either Dada or under the Supreme or this Court's previous holding in the Azarte case, as to exactly how you calculate voluntary departure, the Petitioner was obligated to depart the U.S. between February of 2005, or either February 2005, that would Either way, the Petitioner failed to depart by that time. And so it doesn't really matter which scheme was in place. The Petitioner failed to depart and, therefore, is ineligible for cancellation of removal. Between those dates, when was his hearing before the I.J.? The hearing before the I.J. and the I.J.'s decision was August 30th of 2004. And how much time did the I.J. give him to depart? The I.J. gave him 60 days, although the 60-day period begins to run again with the Board's decision, December 22nd of 2005. So the Board, you know, gives him, okay, now you have 60 days from our decision, December 22nd, 2005, to voluntarily depart. So that's when the period begins. And he claims he didn't know that, right? There's nothing in the record in which he claims that he, that his attorney misinformed him or, you know, told him that he didn't have to voluntarily depart. The immigration judge informed him of his obligation to depart. That's in the record, pages 430 and 431, that he has to voluntarily depart within 60 days of the I.J.'s decision or the decision of the Board. But he would have to, you would agree, apparently under the Board's rulings these days, that he would have to know that the Board has rendered a decision. Well, I believe the case, and I couldn't quite hear the case that Petitioner's counsel was talking about, but I believe the case she's referring to is, was a case in which the Petitioner was not informed that the Board had made a decision. And so it wasn't that the Petitioner didn't know, well, it was that he didn't realize he didn't have the obligation to voluntarily depart from the date of the Board's decision. It was just that he never found out about the decision itself. Right. And I thought that's kind of what's going on here. Well, no. He knew the obligation to depart, but he had been told, he had been, representations had been made to him that they were going to seek relief and whatnot. Well, there's no allegation in the record as to what Mr. Pineda did during this time period. There's no, no allegation that Mr. Pineda told him, okay, don't worry about the voluntary departure period, it stayed. It's, there's no allegation that Mr. Pineda failed to inform him. Why should we draw that kind of inference, given Mr. Pineda's track record with this Court and with the California State Bar and with hundreds of, of other immigrants? Well, I certainly would not suggest that Mr. Pineda is any way, I mean, I know there's plenty of evidence against Mr. Pineda. But here, first of all, the Petitioner does have the burden of proof establishing that reopening is warranted. Second of all, this Court has held repeatedly that it will not presume prejudice. And so, although it may be, so this, so this was a motion to reopen, and generally you take the, the, the statements in the affidavit as true unless there's some reason why you shouldn't. That's correct. But again, there is no statement in the affidavit in which the Petitioner says, Mr. Pineda failed to inform me of the Board's decision or erroneously told me that he was going to file a petition for review that would stay the, the motion to reopen. The Petitioner's affidavits are on pages 96 through 99 of the record. There's also one on page 14, a supplemental, supplemental declaration. The, the supplemental declaration on, on page 14 is the one that I think gives the most detail about this. He says, I was never advised of the option to appeal the denial of my appeal to the Ninth Circuit. And it goes on, I was never advised that this was an option I could exercise to preserve my voluntary departure or that if I did not voluntarily depart at the time of my, my appeal was dismissed by the Board, I would lose my right to voluntary departure. So it's allegations of having not been informed of the obligation to voluntarily depart. It's not a question of Mr. Pineda having wrongly told him that he didn't have to voluntarily depart. The IJ told him, here's the day you have to depart by or 60 days of the Board's order. The Board said that as well. And, and Mr. Pineda, there's no allegation that Mr. Pineda told him, don't worry about what the IJ and the Board have already told you. If there had been that type of an affirmative misrepresentation, this would be a very  And had that allegation been in the record, I don't know. At the time, I don't know how to put this, but so at the time of the Board's decision What was the state of our law, of the Ninth Circuit law? At the time of the Board's decision Regarding voluntary departure. Well, I mean, there are three Board decisions. How about the Ninth Circuit, our case law at that time? The, well, I'll say the Zarte decision was in January, was on January 8th of 2005. So pretty much everything relevant occurred after Zarte. So the filing of the motion to reopen under this Court's precedent at the time would have stayed the voluntary departure period. The filing of a petition for review would have stayed the voluntary departure period. It's not until June 16th, 2008, and that's pretty much after all the relevant things have occurred, that data is decided. So really, during the operative, the relevant time period, it's this Court's decision in Zarte that's relevant. And under that, under that decision, the voluntary departure period would have ended on March 29th, 2006, which is after the Board's decision denying the motion to reopen, but before the petition for review of the Board's denial of the motion to reopen is filed with this Court. So it expires during that, during that time period. And so it would be pretty important for the lawyer at that time to have told the client, either depart or we've got to file a petition for review. Well, I certainly would agree that a good attorney would do that, and the reason a competent lawyer would have done that, right? Correct. But the petitioner was aware of his obligation to depart the United States, and that obligation was made clear to him by the decision of the immigration judge and by the decision of the Board. And the fact that the petitioner was aware of that. But he's aware of all these subsequent filings, too, and the fact that that tolls the running of the time, correct? He did file the subsequent filings did toll the period, although there's no allegation, again, that he was informed, Mr. Panetta exactly told him that what the effect of these things was. Again, the the if there was an allegation that there was some incorrect information that Mr. Panetta gave him, again, this would be a very different case. But the fact that there's no evidence in the record to show that Mr. Panetta did not reiterate what the IJ and the Board had already told the petitioner, that you do have this allegation to depart, again, it's the petitioner's burden of proof, and there's no evidence in the record of. How does one prove that? I mean, a simple statement in the declaration saying, Mr. Panetta told me that I didn't have to leave by this date because the. Scalia, doesn't he say he wasn't informed of these dates? No. He says that Mr. Panetta, he was advised that filing a PFR would preserve his voluntary departure period, or that if I did not voluntarily depart at the time my appeal was dismissed, I would lose my right to voluntary departure. Again, he's not saying that I was somehow unaware of the obligation to voluntarily depart. It's a matter of Mr. Panetta failed to reiterate what the IJ had already told me. You know, most lawyers, I mean, the whole concept of tolling when period, when the time period begins to, when it stops, when it begins to run, what you have to do to stop it, and, you know, lawyers have a hard time with that. With that concept. Admittedly. And I think the, again, what the Petitioner was told by the IJ was you have to voluntarily depart within 60 days. The Board's decision, you have to voluntarily depart within 60 days. Whether or not he understands that the voluntary departure, that the motion to reopen would toll it or not, whether he understands the petition for review would toll it or not, really there has to be some allegation by Mr. or some misstatement by Mr. Panetta as to don't worry about it. Don't have to voluntarily depart. And I can't find what I'm thinking of when I read this stuff, but I thought there was, that's what I had assumed was in here, but maybe I'm wrong. Again, as far as I can tell, the relevant portions are on 14 and then page 99. Well, I was looking at 99, and it doesn't say what you say. At least I don't read it that way. I don't have 14, so I can't take a look at it right now. I'll have to take a look at it later. But again, the point being the Petitioner was informed of his obligation to depart the country, and again, there's no evidence to suggest that Mr. Panetta wrongly or incorrectly told him otherwise. And if my time is up, for those reasons also, the due diligence issue, we'd ask that the Court deny the petition for review. Thank you. Just a brief rebuttal. The diligence issue, we believe, is met. He acted promptly once he knew, Petitioner, that there was a problem to try to investigate and then retain new counsel. The prejudice is clear. The immigration judge noted that this was the type of case she believed. Had she proper medical documentation on the wife? That's only one part of the prejudice. Can you respond to what counsel was talking about with respect to what he knew or didn't know? Well, I mean, I think it's indicative of the fact that Respondent cites two different alternative dates, one which is a retroactive application of DADA. And the fact that we're debating these dates, I think it's unreasonable unless he was and under what circumstances. And, in fact, after both of these dates that Respondent has cited, one under DADA and one under ASARTE, Mr. Pineda proceeded to present evidence which should have been presented at the hearing, which would lead a reasonable petitioner to believe that the case was still being considered. So I don't believe that Mr. Pineda fulfilled his obligation. I don't believe there's anything in the record. And I don't believe that the burden should be solely on Petitioner in this situation to somehow be able to calculate his voluntary departure, despite his lawyer's representations that further filings were being made. Respondent says in its brief that Mr. Alejo's own evidence suggests that he began in the brief at page 14. Mr. Alejo's own evidence suggests that he became aware of Attorney Pineda's alleged ineffective assistance well before his retaining new counsel on January 11, 2007. Respond to that. I think he had suspicions that something was wrong, but the Associates and Mr. Pineda's office basically told him, we're going to submit the new evidence, they just want this, or we're going to appeal. I don't think he was sure until he found that Mr. Pineda was no longer practicing law, that there was really a problem. And he went to Mr. Zaslow. I spoke to Mr. Zaslow in December 2006, then promptly came to me and retained me, and we filed a motion to reopen approximately 30 days after that. Okay. Thank you. Thank you. Well, the VS v. Holder is submitted at this time.
judges: Watson, Hug, Paez